Filed 6/17/26  In re N.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>B.C.,<br><br>    Defendant and Appellant. | D087486<br><br>(Super. Ct. No. NJ016086) |

APPEAL from an order of the Superior Court of San Diego County, Alejandro Morales, Judge.  Affirmed.

William D. Caldwell for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado Chief Deputy County Counsel, Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Neale B. Gold for Minor.

Appellant B.C. (Father) appeals from an exit order governing child custody and visitation issued by the juvenile court in a dependency proceeding.

In January 2024, Father moved from Indiana to California with C.W. (Mother) and their child, N.C. Father had received military orders stationing him in San Diego. At that time, Father and Mother were not in a relationship, and Father had full physical custody of N.C. under an order issued by an Indiana court. The family came to the attention of the San Diego County Health and Human Services Agency (Agency) after Father committed at least two acts of physical violence against Mother in N.C.'s presence. The Agency brought a petition under Welfare and Institutions Code section 300, subdivision (b)(1) (section 300(b)(1)), seeking to protect N.C. from exposure to further violence.

After the juvenile court learned of the Indiana court order at the detention hearing, it contacted the Indiana court to discuss jurisdiction issues under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code[1], § 3400 et seq.). During that communication, the Indiana judicial officer ceded jurisdiction to the juvenile court. The Indiana judge concluded the parents and N.C. no longer resided in Indiana and determined California was the more appropriate forum. As a result of the Indiana court ceding jurisdiction, the juvenile court proceeded to conduct a contested jurisdiction and disposition hearing. It made a true finding on the petition, removed N.C. from Father's custody, and gave Mother full legal and

---

[1] Further undesignated statutory references are to the Family Code.

physical custody. The juvenile court also authorized Mother to move with N.C. back to Indiana, where she had significant family support.

On appeal, Father raises two issues. First, he contends the juvenile court failed to comply with the UCCJEA when it asserted permanent subject matter jurisdiction over the child's custody matter. Father complains that neither the California juvenile court nor the Indiana court it contacted sufficiently considered the fact that Father was in California only due to military orders, which, he asserts, means he is not a resident of California. In Father's view, Indiana continues to be N.C.'s home state and *it* possesses continuing exclusive jurisdiction, rendering the California juvenile court's custody order invalid.

Second, Father contends that even if the juvenile court properly asserted permanent jurisdiction over N.C., the court abused its discretion in ordering Father to have only *supervised* visitation with his son.

Having considered both of Father's arguments, we affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother grew up in Indiana and their families continue to reside there. N.C. was born in Indiana in October 2022.

On June 5, 2023, an Indiana court issued an order regarding N.C.'s custody. Because the parents were not married at the time of N.C.'s birth, the Indiana court adjudged Father the legal and biological father of N.C. It also confirmed by order the parents' agreement that they would share legal custody and Father would have primary physical custody. With all pending issues resolved, no further hearings were set by the Indiana court.

Approximately six months later, in January 2024, the parents and N.C. moved to California together after Father received military orders stationing

3

him in San Diego. Although Mother and Father were no longer in a romantic relationship, the parties lived together after the move. Mother began working at the Brown Child Development Center in March 2024. Mother also attended vocational college in San Diego from January through June 2025.

The family first came to the attention of the Agency in May 2025 due to a report of domestic violence. N.C. was a little over two and half years old at the time. Mother reported to law enforcement that Father had punched her in the face, pushed her, grabbed her by her hair, and hit her head into a wall. During this incident, N.C. was knocked to the ground as well, where he hit his head. Mother refused to seek an Emergency Protective Order at this time.

Mother moved out of the home, at least temporarily. Both parents were offered referrals for services through the Family Advocacy Program and the Agency, but neither participated in the services at this point.

Mother returned to the shared home on August 22, 2025.[2] The next day, August 23, more violence occurred. Mother attempted to leave the home, and Father grabbed her from behind, forcing her to the ground. He restrained Mother by placing his left arm around her neck. He also pointed a loaded rifle at Mother, for approximately two hours, and threatened to shoot her and kill himself. N.C. was present in the home during these events and had been going in and out of the room where the violence was occurring.

---

[2] The Agency report documenting this information refers to the date Mother returned to the home where Father lived as "08/22/2023," but the year reference appears to be typographical error.

4

Police reviewed a video Father took during the incident. In it, Mother appeared frantic and appeared to be struggling to breathe. Father was arrested, and Mother sought and obtained an emergency protective order. A few days later, she obtained a temporary restraining order protecting herself and N.C.

A social worker from the Agency helped Mother create a safety plan to protect N.C. Father, who had posted bail, declined to participate in creating a safety plan and asserted he would only participate if N.C. were placed in his care. Father later declined to participate in a domestic violence group, and he denied the violent incident had occurred.

Six days after the incident, Father's military command issued a military protective order (MPO) protecting Mother and N.C. and prohibiting Father from contacting them. Father did not provide the Agency with a copy of this order, but he later reported that the MPO had been modified to permit him to have supervised visitation with N.C.

At a hearing that took place on September 22, 2025, in the parents' restraining order proceedings, a family court judge granted Father four hours of supervised visitation with N.C. on Saturday and on Sunday, every week. The court denied Father's request to remove the temporary restraining order that had been put in place.

Two days later, the Agency filed a petition under section 300(b)(1), seeking to protect N.C. from ongoing domestic violence. The detention hearing took place on September 29, 2025, and at that hearing, the juvenile court asserted emergency jurisdiction over N.C. under the UCCJEA. It also decided to "conduct an inquiry" into permanent subject matter jurisdiction. In response to the juvenile court's inquiry, Mother explained that N.C. had been born in Indiana, and she described her extended family as being in

Johnson County, Indiana. She recalled that she, Father, and N.C. moved to San Diego County, California in January 2024, as a result of Father's military assignment.

The juvenile court indicated it would conduct "further inquiry from Indiana, specifically Johnson County." It then made a prima facie finding on the Agency's petition, determined continued care in Father's home would be contrary to N.C.'s welfare, and detained him in Mother's care.

In early October 2025, the juvenile court documented an ex parte telephone call it had conducted with the Honorable Michael T. Bohn, Magistrate of the Juvenile and Family Division of the Johnson Circuit Court of Indiana. Judge Bohn informed the juvenile court that the Johnson Circuit Court had been involved in a paternity matter involving the family. The Indiana court had entered an order establishing paternity and confirming a custody arrangement the parties had reached.[3] Given the Indiana court's "limited involvement" with the family, as well as the fact that the parties were now living in California, Judge Bohn determined the Indiana court would cede its permanent subject matter jurisdiction over N.C. to the California court. Alternatively, he determined that the Indiana court would cede jurisdiction because the California court was a more appropriate forum for addressing the most recent matters involving the family.

In its jurisdiction and disposition report, the Agency recommended N.C. be placed with Mother, with the Agency providing Mother family maintenance services. The Agency also recommended Father receive enhancement services, as well as liberal but supervised visitation consistent

---

[3]  A copy of the Indiana court order was provided to the juvenile court and filed in the California proceeding.

with the MPO. Mother and Father presented differing views to an Agency social worker regarding what had occurred between them. Mother maintained her allegations of domestic violence were true, while Father claimed Mother was lying. He did not participate in services.

At the jurisdiction and disposition hearing on October 20, 2025, the juvenile court set the matter for a contested trial and authorized Mother to travel with N.C. for a brief visit to Indiana.

In an addendum report filed with the court in early January 2026, the Agency recommended Mother be granted full physical and legal custody of N.C., with Father continuing to have "liberal supervised visitation." At this point, the Agency recommended the juvenile court issue the custody orders and terminate jurisdiction. The juvenile court held a trial on jurisdiction and disposition on January 7, 2026. The court indicated to the parties that it had received the custody order issued by the Indiana court when it conducted its UCCJEA inquiry with Judge Bohn. The Agency, Mother, and minor's counsel all requested the juvenile court follow the recommendations for custody made in the Agency's addendum report. Mother was also requesting authorization to allow her to relocate to Indiana with N.C. Counsel for N.C. agreed with Mother's request. Father opposed the Agency's recommendations and argued N.C. should be returned to his care. The juvenile court continued the hearing to allow the parties a chance to review case authorities that had been raised at the hearing and to complete additional research.

Five days later the parties returned and offered additional legal arguments. At that point in time, Father submitted a letter from the district attorney's office indicating no charges had been filed against him. Father's attorney acknowledged the juvenile court possessed broad discretion to issue custody orders, including ones that would permit a parent to move out of

California, but argued that it would not be in N.C.'s interest to permit Mother to move him out of state.

The court acknowledged Father had not been prosecuted but noted the standard of proof for a criminal case is different from the proof to be applied in a dependency proceeding. The court explained it believed Mother's initial statements about what had occurred, even though at one point she appeared to recant. Specifically, the court gave great weight to Mother's early, specific statements about the violence because there was corroborating evidence to support her claims. Thus, the court believed the domestic violence was significant and involved Father pointing a gun at Mother for hours, while at times straddling her and placing her in a "stronghold."

The court noted California's policy that children have the right to be safe and free from abuse, and that the perpetration of domestic violence in the household where a child lives is detrimental to that child's health, safety, and welfare. Father, however, repeatedly denied the abuse happened and "barely engaged in services." In fact, the court noted multiple times that Father consistently denied the abuse occurred, both to his commanding officers and to law enforcement. In the context of the significant violence that had taken place, the court concluded that placing N.C. in Father's care would create a "substantial risk" to N.C.'s safety and emotional well-being.

In contrast, Mother had "engaged in protective steps by obtaining the restraining order, [and] by enrolling in classes in a timely fashion." The court acknowledged Mother's support system was in Indiana. It had heard from both the Agency and Mother that this support network would be beneficial to help Mother protect N.C. from further exposure to domestic violence. The court ultimately awarded Mother sole legal and physical custody and approved her request to move with N.C. to Indiana, finding these orders

8

would be in N.C.'s best interest. The court also ordered its jurisdiction would be terminated after a brief seven-day stay of its orders.

Father's attorney requested that he be granted virtual or telephone visits four times per week for a minimum of 30 minutes, and that if he were to travel to Indiana he be permitted in-person visitation, offering that such visitation could be supervised "by a mutually agreed-upon third party." Mother did not oppose the request, and the court adopted those visitation orders, which included in-person supervised visitation of at least two hours per week if Father traveled to Indiana.

## DISCUSSION

### *The Juvenile Court Did Not Err in Asserting Permanent Subject Matter Jurisdiction Under the UCCJEA*

Father contends the juvenile court improperly exercised permanent subject matter jurisdiction, given that Father was living in California solely due to military orders. According to Father, neither the California nor Indiana court "considered Father's active-duty military status and the impact o[f] that status on his domicile and residency."

The UCCJEA " 'is designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees.' " (*In re Aiden L.* (2017) 16 Cal.App.5th 508, 516.) Nearly every state in the United States, including Indiana, has adopted the UCCJEA. (Ind. Code Ann. § 31-21-1-1 et seq.; see *In re L.C.* (2023) 90 Cal.App.5th 728, 735 [noting 49 states have adopted the UCCJEA].)

The UCCJEA provides the exclusive method for determining the proper forum to decide custody issues involving a child who is subject to a sister-state custody order. (§ 3421, subd. (b) ["[s]ubdivision (a) [of § 3421] is

9

the exclusive jurisdictional basis for making a child custody determination by a court of this state"]; see *Segal v. Fishbein* (2023) 89 Cal.App.5th 692, 702; *In re A.C.* (2017) 13 Cal.App.5th 661, 668.) A primary purpose of the UCCJEA is " ' "to encourage states to respect and enforce the prior custody determinations of other states, as well as to avoid competing jurisdiction and conflicting decisions." ' " (*Segal*, at p. 702.) Thus, " '[t]he UCCJEA ensures that only one state has jurisdiction to make "child custody determinations" ' " at a time (*id.* at p. 702), and it "takes a strict ' " 'first in time' " ' approach to jurisdiction." (*Id.* at p. 703.)

"The general rule of the UCCJEA, subject to certain delineated exceptions, is that once the court of an appropriate state—that is, one having jurisdiction under its terms—has made an initial child custody determination, that court obtains exclusive, continuing subject matter jurisdiction over the child." (*A.H. v. Superior Court* (2023) 89 Cal.App.5th 504, 523 (*A.H.*).)[4]

The parties agree that even where a different state possesses exclusive, continuing subject matter jurisdiction over a child, California may nevertheless assert temporary emergency jurisdiction to protect a child from an imminent risk of mistreatment or abuse. (See § 3424, subd. (a); *In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1349–1350.) And Father concedes the California court properly exercised temporary emergency jurisdiction to protect N.C. He contends, however, that the court's "emergency jurisdiction

---

[4] A " ' "[c]hild custody determination" ' " means any judgment, decree, or other order providing for the legal or physical custody of, or visitation with, a child, and it includes permanent, temporary, initial, and modification orders. (*A.H., supra*, 89 Cal.App.5th at p. 523.)

10

never properly ripened to permanent jurisdiction," and, in his view, Indiana retained exclusive permanent subject matter jurisdiction under the UCCJEA, such that the California court acted without jurisdiction in issuing the custody order Father now challenges.

"[A]s with any statute, interpretation of the UCCJEA is a question of law we review de novo." (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1287.) Factual findings made in connection with assessing jurisdiction under the UCCJEA, however, are "reviewed under the deferential substantial evidence standard" (*id.* at p. 1286) and its "resolution of conflicts in the evidence and credibility assessments are binding on [a reviewing] court." (*Id.* at p. 1287.)

Section 3423 sets out the circumstances in which a California court can go beyond emergency jurisdiction to assert permanent subject matter jurisdiction over a child where another state otherwise possesses exclusive subject matter jurisdiction because it previously ruled on custody. This provision directs that a California court may alter a custody determination entered by a court of another state only where (a) "a court of this state has jurisdiction to make an initial determination under paragraph (1) or (2) of subdivision (a) of Section 3421," *and* (b) either "[t]he court of the other state determines it no longer has exclusive, continuing jurisdiction under Section 3422 or that a court of this state would be a more convenient forum under Section 3427," *or* "[a] court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state." (§ 3423.) As we explain, the juvenile court's assertion of jurisdiction was proper under this provision.

We begin with the part of section 3423 that requires a California court to consider whether it would have jurisdiction to make an initial

11

determination under either paragraphs (1) or (2) of subdivision (a) of section 3421. These portions of section 3421 provide:

> "(a) Except as otherwise provided in Section 3424, a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true:
>
> "(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
>
> "(2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under Section 3427 or 3428, and both of the following are true:
>
> "(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.
>
> "(B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships." (§ 3421, subd. (a)(1), (2).)

We need not decide whether subdivision (a)(1) of section 3421 applies here because the record includes substantial evidence to support the juvenile court's determination the circumstances set out in subdivision (a)(2) are present. First, and importantly, upon learning of the Indiana court's custody order, the juvenile court reached out to that court to discuss the emergency matter that brought the family into a California juvenile court proceeding. This was precisely what the UCCJEA directs a court to do when it becomes aware a sister state has made a child custody determination: "When a

California court asserting temporary emergency jurisdiction is aware that a child custody determination has been made by another jurisdiction, the California court 'shall immediately communicate with the other court.' " (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1097, quoting § 3424, subd. (d).)[5] Such coordination is necessary because " '[t]o make an appropriate order under the [UCCJEA], the California court needs to know whether the sister state court wishes to continue its jurisdiction and how much time it requires to take appropriate steps to consider further child custody orders.' " (*Cristian I.*, at p. 1097.)

During the telephone call, Judge Bohn of the Johnson Circuit Court of Indiana confirmed an Indiana court had issued a custody order involving N.C. However, Judge Bohn described the Indiana court's involvement with the family and N.C. as "limited." Given this and given Judge Bohn's understanding that N.C. and his parents were currently living in California, he determined the Indiana court would cede its continuing permanent subject matter jurisdiction over N.C.'s custody determinations to the California court. Judge Bohn also concluded that ceding jurisdiction to the California court should occur because California was a more appropriate forum for addressing the family's most recent custody matters.

Based on the communication between the juvenile court and the Indiana court, the juvenile court properly concluded the court of Indiana— N.C.'s original "home state"—was "declin[ing] to exercise jurisdiction on the

---

5       And even where temporary emergency jurisdiction is not at issue, the UCCJEA contemplates the need for communication between states as soon as the court of one state determines a custody proceeding has already been commenced in another state having jurisdiction under the UCCJEA. (See § 3426, subd. (b).)

grounds that" California "is the more appropriate forum under Section 3427 or 3428"[6] (§ 3421, subd. (a)(2)).

The next question the juvenile court faced was whether N.C. and at least one parent "have a significant connection with" California other than merely being present in the state. (See § 3421, subd. (a)(2)(A).) There is abundant evidence of N.C. and both parents having a "significant connection" to California. Both parents moved to California with N.C. in January 2024, and these proceedings occurred over a year later. During that time, Father was assigned to San Diego for his military duty, and Mother obtained employment at a child development center after attending a vocational college in San Diego for six months. N.C. attended daycare at the center where Mother worked, and he received regular medical care in San Diego. Both parents sought the assistance of the San Diego Superior Court to obtain mutual restraining orders. These connections are sufficiently "significant" for purposes of the UCCJEA. (See *In re Ari S.* (2021) 69 Cal.App.5th 1125, 1132 [significant connections existed where evidence demonstrated mother and child lived in various parts of the state, mother owned property and had litigated in California].)

---

[6] Section 3427 provides in relevant part: "A court of this state that has jurisdiction under this part to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court." (§ 3427, subd. (a).) Alternatively, section 3428 provides that if a California court "has jurisdiction under this part because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction unless one of" three enumerated circumstances is also true.

14

In addition, it is clear that the vast majority of evidence "concerning [N.C.'s] care, protection, training, and personal relationships" is in California. (§ 3421, subd. (a)(2)(B).) Again, N.C. was only approximately a year old when the parents relocated him to San Diego, and he had been living in California for more than a year at the time of the proceedings. The domestic violence that caused N.C. to come to the attention of the court occurred in California. N.C. was receiving daily care and health care in San Diego. And the services Mother and Father had received to try to ensure N.C.'s safety and well-being all took place in California. Thus, evidence regarding N.C.'s care and protection existed in California.

Finally, section 3423 requires either that "[t]he court of the other state determines it no longer has exclusive, continuing jurisdiction under Section 3422 or that a court of this state would be a more convenient forum under Section 3427" (*id.*, subd. (a)), or that "[a] court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state" (*id.*, subd. (b)). The record demonstrates, at a minimum, that the first of these was true. Again, Judge Bohn expressly told the juvenile court that the Indiana court was ceding jurisdiction on two grounds, one of which was that California would be a more convenient forum to decide the custody issues.

In sum, the record supports the juvenile court's jurisdictional findings and its ultimate conclusion that it possessed jurisdiction to alter the Indiana court's earlier custody determination. Specifically, the court possessed jurisdiction to make a final custody determination regarding N.C. because it had jurisdiction "to make an initial determination [regarding custody] under paragraph . . . (2) of subdivision (a) of Section 3421" (§ 3423) *and* the Indiana court ceded jurisdiction after determining "that a court of this state would be

15

a more convenient forum" (*id.*, subd. (a)).  Because it is clear the juvenile court properly asserted permanent subject matter jurisdiction under statutory provisions that do not necessitate any finding with respect to whether Father resided in California, we need not determine the effect, if any, of military assignments or orders on the question of a parent's residence under the UCCJEA.  And, to the extent Father questions the correctness of the Indiana court's conclusion that the parties no longer resided in Indiana, it should go without saying that this court has no ability to review a sovereign sister court's UCCJEA findings and determinations as to whether and when to cede jurisdiction in any particular case.  Further, the juvenile court had no reason to second-guess the Indiana court's UCCJEA determinations.  Instead, given the family's significant connections to California, the juvenile court acted reasonably in relying on the Indiana court's decision to cede its continuing exclusive jurisdiction to the California juvenile court.  Again, what occurred in this matter is what the UCCJEA contemplates should occur: once the California juvenile court became aware that the Indiana court had already exercised jurisdiction to make a custody order regarding N.C., it communicated with the Indiana court to inquire whether that court wished to retain jurisdiction.  And it was only after the Indiana court decided the California court was the most convenient forum and ceded its jurisdiction that the juvenile court issued its custody order.  The juvenile court committed no error.

### *The Juvenile Court Did Not Abuse Its Discretion in Ordering Supervised Visitation for Father*

Father next argues the juvenile court's exit order should be modified to allow him unsupervised visits with N.C.  According to Father, the court abused its discretion in ordering that his virtual visits from California to

16

Indiana and any in-person visits in Indiana be supervised. Father asserts the order for supervised visits does not promote N.C.'s best interest.

When a juvenile court terminates jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders in the child's best interest. (*In re Chantal S.* (1996) 13 Cal.4th 196, 203.) The juvenile court makes custody determinations by looking at the totality of the child's circumstances, without employing any preferences or presumptions. (*Id.* at p. 206.) In making custody orders, the court possesses discretion to impose conditions or restrictions on a parent's visitation, and it may also deny visitation in appropriate circumstances. (*Id.* at pp. 213–214.)

Father acknowledges a juvenile court's custody order is reviewed for abuse of discretion. (See *Bridget A v. Superior Court* (2007) 148 Cal.App.4th 285, 300–301.) Under this standard, a reviewing court will not disturb a trial court's exercise of discretion unless the trial court's decision was arbitrary, capricious, or absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

According to Father, the juvenile court abused its discretion in limiting him to only supervised visits with N.C. because he participated in voluntary services, provided financial and other types of support to N.C., and had not been criminally charged in connection with Mother's allegations of domestic violence. He also asserts there were no continuing safety concerns regarding his visitation with N.C. because Father and Mother no longer lived together. Father also complains that the restraining order Mother obtained did not limit him to supervised visits only, and he asserts the juvenile court incorrectly believed he had stopped attending his domestic violence classes and relied on that false belief to conclude supervised visits were necessary. Father argues that given all of these circumstances, the "limitations" on his

visits are "arbitrary in light of the child's entirely positive contact with his father."

We see no abuse of discretion in the juvenile court's decision to require Father's visitation with N.C. be supervised. The domestic violence that brought this family to the Agency's attention was significant. And, while the violence may not have been intentionally directed at N.C., the evidence demonstrated not only that N.C. was present during lengthy episodes of violence that occurred multiple times, but also that he himself was knocked to the ground, where he hit his head.

The lack of formal charges against Father arising from these incidents does not mean the violence did not occur. Nor does the absence of charges mean the juvenile court should take a particular view of the evidence, or that it should circumscribe its independent assessment of the historical facts and its ultimate determination as to what would be in a child's best interest. (See *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562–563 [lack of criminal charges does not establish that it would be in a child's best interest to undo order terminating reunification services].)

Further, the record demonstrates that Father repeatedly denied having engaged in domestic violence, and although he eventually did start to participate in a domestic violence group, his participation came later in the process. As of November 20, 2025, Father had attended only three domestic violence offender group sessions. And while Father argues the juvenile court was incorrect in believing at the time of the January 2026 hearing that Father "stopped going" to his domestic violence group class, the record before the court reflected that Father's most recent recorded attendance with his domestic violence group occurred on November 17, 2025. The social worker's subsequent calls to check on Father's attendance had been unanswered and

unreturned. In other words, the court was describing what appeared in the record, and neither Father nor Father's attorney objected to the court's description or offered testimonial or documentary evidence to the contrary.

But even if one were to assume the court incorrectly described Father as having "stopped" attending his domestic violence group when Father had continued to attend, the record demonstrates that the court's true concern about Father's participation in the domestic violence group was less about whether Father formally continued with or completed his services, and more about the fact that Father's current conduct indicated he had not managed to incorporate the lessons from such classes into his life. For example, the court repeatedly expressed unease with the fact that Father continued to deny the domestic violence occurred. And the court was troubled by the fact that Father's own counselor relayed that Father was in another relationship that appeared "toxic." To the court, this indicated Father "hasn't addressed [the] domestic violence concerns."

The court believed the totality of the circumstances, including Father's lack of accountability and insight about his past domestic violence and his apparent failure to incorporate the lessons from the services in which he did participate, meant that the risk of further domestic violence remained an issue. On this record, we conclude it was reasonable for the court to be concerned, and therefore the court did not abuse its discretion in deciding that the course of action that would best promote N.C.'s safety and well-being was to order Father's visitation supervised.

19

## DISPOSITION

The order of the juvenile court is affirmed.


BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.